UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KEVIN WOHLERT and WESTFIELD
NATIONAL INSURANCE COMPANY,

    Plaintiffs,

v.                Civil No. 12-54 (JNE/SER)
                  ORDER

HARTFORD FIRE INSURANCE COMPANY
and THE TRAVELERS INDEMNITY
COMPANY OF AMERICA,

    Defendants.

  Plaintiffs Kevin Wohlert ("Wohlert") and Westfield National Insurance Company ("Westfield") brought this declaratory judgment action against Defendants Hartford Fire Insurance Company ("Hartford") and The Travelers Indemnity Company of America ("Travelers") to determine the priority of insurance among the three insurers with respect to a car accident that occurred on July 22, 2009. Now before the Court are the parties' cross-motions for summary judgment.

## I. BACKGROUND

  Wohlert is a resident of Minnesota. In July 2009, Wohlert was employed as a traveling manufacturer's representative (or "National Sales and Training Manager") by Rheinzink America, Inc. ("Rheinzink"), a Massachusetts corporation. During his employment, he was based in Minnesota. He spent about 60-70% of his time traveling throughout the United States and Canada. On July 22, 2009, while in Nevada on a business trip, Wohlert rear-ended a car driven by Dale Southam ("Southam"), a Nevada resident. At the time of the accident, Wohlert was driving a rental vehicle, paid for by Rheinzink, and was acting within the course and scope of his employment with Rheinzink. Southam subsequently commenced suit in Nevada against

1

Wohlert and Rheinzink, seeking damages for property damage and personal injuries suffered as a result of the accident.[1]

At the time of the accident, Wohlert was insured under a personal automobile policy issued by Westfield. Rheinzink also maintained two insurance policies that provided coverage for the July 22 incident. Hartford issued Rheinzink a business insurance policy, and Travelers issued Rheinzink a commercial automobile insurance policy. When Southam filed his lawsuit in Nevada, Westfield undertook Wohlert's defense. Westfield tendered the defense to Hartford on two occasions, but Hartford refused the tender both times. On December 8, 2011, Plaintiffs brought suit against Hartford in Minnesota state court. On January 6, 2012, Hartford removed the action to federal district court. In April 2012, nearly two years after the underlying Southam litigation had commenced, Plaintiffs learned of the existence of the Travelers policy. It was only at this time that Travelers was made aware of the accident and the underlying Southam litigation. Travelers, however, believed that Hartford was defending both Rheinzink and Wohlert. On June 20, 2012, Plaintiffs amended their Complaint to include Travelers as a defendant in this action. On July 5, 2012, Travelers was served with the Amended Complaint. It was then that Travelers was made aware that only Westfield had been defending Wohlert.

None of the insurers dispute that they provide coverage for Wohlert for the incident— they do dispute the priority of coverage. Each of the three insurers claims that its policy provides only excess coverage, and that one or both of the other insurers' policies provide primary coverage.[2]

---

[1] In the Nevada litigation, Rheinzink stipulated to vicarious liability for Wohler's conduct.

[2] Hartford and Travelers have been defending Rheinzink in the underlying Southam litigation. They now contend that Westfield should be defending Rheinzink, as well as Wohlert. This issue, however, is not properly before the Court. There is no pleading in which such a

**A. Westfield Policy**

Westfield is an Ohio corporation, authorized to do business in the State of Minnesota. At the time of the accident, Wohlert was insured by Westfield under a combined homeowners and automobile policy, with a policy limit of $500,000. This policy covered four vehicles, all registered in Minnesota, and Wohlert paid $2,296 in premiums for auto liability coverage. There was no separate premium charged for rental auto coverage.

The Westfield policy provides Auto Liability Coverage as follows:

**SECTION IV AUTO LIABILITY**
**COVERAGE G – AUTO LIABILITY**

1. We will pay damages for ***bodily injury*** or ***property damage*** for which any ***insured*** becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages which are payable under the terms of this policy. In addition to our limit of liability, we will pay all defense costs we incur.

2. ***"Insured"*** as used in Coverage **G** means:

    a. You or any ***family member*** for the ownership, maintenance or use of any auto or ***trailer***.

    . . .

4. For any auto or ***trailer***, other than ***your covered auto***, any other person or organization but only with respect to legal responsibility for acts or omissions of you or any ***family member*** for whom coverage is afforded under this section. This provision (**4.**) applies only if the person or organization does not own or hire the auto or ***trailer***.

The Westfield policy sets forth the following exclusions:

A. We do not provide Auto Liability Coverage for any ***insured***:

    7. Maintaining or using any vehicle while that ***insured*** is employed or otherwise engaged in any ***business*** not described in Exclusion **A.6.** above.

---

declaratory judgment is sought, nor is there any such assertion in any of the Answers to Plaintiff's Interrogatories.

This exclusion (**A.7.**) does not apply to:

b. The ownership, maintenance or use of a ***rental vehicle*** or ***temporary loaned vehicle***; or

c. ***Property damage*** to a:

(1) ***Rental vehicle***

As a condition to Westfield's Auto Liability Coverage, the policy provides:

**2. OTHER INSURANCE**
   **Coverage G – Auto Liability**

   a. If there is other applicable liability insurance we will only pay our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits.

   b. Any insurance we provide for a vehicle you do not own . . . shall be excess over any other collectible insurance, self-insurance or bond.

**B. Hartford Policy**

Hartford is a Connecticut corporation. At the time of the accident, Rheinzink was insured under a commercial general liability (or "Spectrum") policy issued by Hartford. The policy covered Rheinzink's business properties in Massachusetts, provided business liability coverage, and also provided up to $1,000,000 in coverage for Hired/Non-Owned Auto liability. The total premium charged for the Hartford policy was $4,028. The portion of the premium attributable to the Hired/Non-Owned Auto Endorsement was $233.

The Hartford policy provides Business Liability Coverage as follows:

**A. COVERAGES**

   **1. BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**

   **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage" or "personal

4

and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

"Insureds" under the Hartford policy include "your 'employees' . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business." The Business Liability Coverage excludes coverage for auto-related injuries.

**B. EXCLUSIONS**

1. **Applicable To Business Liability Coverage**
   This insurance does not apply to:

   . . .

   g. **Aircraft, Auto Or Watercraft**

   "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

The Hartford policy includes a "Hired Auto and Non-Owned Auto" Endorsement, which modifies the insurance policy as follows:

A. Under **B., EXCLUSIONS, 1. Applicable to Business Liability Coverage**, exclusion **g.** does not apply to any "auto" that is a "non-owned auto."

   A "non-owned auto" is an "auto" you do not own including but not limited to:

   1. An "auto that you lease, hire, rent or borrow . . .

B. With respect to the operation of a "non-owned auto," **WHO IS AN INSURED** is replaced by the following:

   The following are "insureds":

   a. You
   b. Your "employee" while using with your permission:
      (1) An "auto" you hire or borrow;
      (2) An "auto" you don't own, hire or borrow in your business or personal affairs; or
      (3) An "auto" hired or rented by your "employee" on your behalf and at your direction.

5

The Hartford policy also contains the following "other insurance" provision:

D. With respect to the operation of a "non-owed auto," the following additional conditions apply:

   **1. OTHER INSURANCE**

   a. Except for any liability assumed under an "insured contract" the insurance provided by this Coverage Form is excess over any other collectible insurance.

   . . .

   b. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**C. Travelers Policy**

Travelers is a Connecticut corporation. At the time of the accident, Rheinzink was insured by Travelers under a Commercial Automobile Policy, with a policy limit of $1,000,000. The policy covered one specified business automobile, and also provided coverage for hired or borrowed automobiles. Travelers charged a total premium of $1,475, with a $32 premium for the hired or borrowed auto coverage.

The Travelers policy provides Liability Coverage as follows:

A. **Coverage**

   We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

   . . .

   We have the right and duty to defend any "insured" against a "suit" asking for such damages . . . .

   1. **Who Is An Insured**

      The following are "insureds":

a. You for any covered "auto."

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow . . . .

With respect to bodily injury and liability coverage, "covered autos" includes "hired 'autos,'" or "those 'autos' you lease, hire, rent or borrow."

The following condition applies to the coverage provided under the Travelers policy:

5. **Other Insurance**

   a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.

   . . .

   d. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

The Travelers policy contains an "Auto Coverage Plus Endorsement," which provides:

H. **EMPLOYEE HIRED AUTOS**

**Section II – LIABILITY COVERAGE, A. Coverage, 1. Who Is An Insured** is amended by adding the following:

An "employee" of yours is an "insured" while operating an "auto" hired or rented under a contract or agreement in that "employee's" name, with your permission, while performing duties related to the conduct of your business.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the

7

absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Choice of Law**

Plaintiffs filed this lawsuit in state court in Minnesota, and Hartford removed the action to federal district court. Plaintiffs assert that Minnesota law governs the coverage dispute between Westfield, Hartford, and Travelers. Travelers argues that Massachusetts or Nevada law governs the dispute. Hartford argues that Massachusetts law applies. None of the three insurance contracts includes a choice-of-law provision.

"In determining which state's law applies, we generally employ the forum state's choice-of-law rules." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012). "Minnesota's choice-of-law rules involve a multistep analysis." *Id.* "The first step requires examination of whether the different states' laws actually present a conflict, *i.e.*, 'if the choice of one forum's law over the other will determine the outcome of the case.'" *Id.* (quoting *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn.2000)). Here, the parties agree that there is an outcome-determinative conflict between the laws of Minnesota, Massachusetts and Nevada.[3]

---

[3]  Under Massachusetts and Nevada law, the courts look to the "other insurance" provisions to determine priority of coverage. When insurance policies each contain "other insurance" clauses that conflict with each other, the clauses are disregarded and the loss is pro-rated between the respective insurers. *See Alamo Rent-A-Car, Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 P.2d 1074, 1076 (Nev. 1998); *Mission Ins. Co. v. U.S. Fire Ins. Co.*, 517 N.E.2d 492, 465 (Mass. 1988) (finding conflicting excess clauses to be mutually repugnant). Under Minnesota law, the courts determine the priority of coverage based on an analysis of the "total policy insuring

8

"The second step requires determination of whether the different states' laws constitutionally may be applied to the case at hand." *Id.* The parties do not argue that there are any constitutional concerns with the application of the laws of any of the three states. The Court agrees that Minnesota, Massachusetts and Nevada have sufficient contacts such that the law of any of those states could be constitutionally applied. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981) ("[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.").

"The third step requires application of a multifactored test, considering the: '(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law.'" *Whitney*, 700 F.3d at 1124 (quoting *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994)). These factors are not intended to be applied mechanically, but instead "prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law." *Jepson*, 513 N.W.2d at 470.

As a preliminary matter, the Court believes that Nevada law is the least applicable to this dispute. In a dispute concerning insurance coverage, "where an accident occurs is unimportant." *Id.* The Court examines "whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action, not to whether that choice was predictable

---

intent" and "closeness to the risk." *See Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80, 88 (Minn. Ct. App. 2002) (explaining that under Minnesota law, "priority among insurance policies is not to be determined by the presence or absence of other-insurance clauses, but by an analysis of the function and intent of the policies").

after the transaction or event." *Nesladek v. Ford Motor Co.*, 46 F.3d 734, 738 (8th Cir. 1995). The Hartford and Travelers policies were issued to a Massachusetts-based employer, and the Westfield policy was issued to a Minnesota resident. It may have been predictable for the Hartford and Travelers policies to be governed by Massachusetts law, and for the Westfield policy to be governed by Minnesota law, but prior to the Southam incident, it would not have been predictable for any of the policies to be governed by Nevada law. Nevada has little connection with the insurance priority issue being litigated in this dispute, and although Nevada has an interest in ensuring that its residents are compensated for injuries suffered as a result of auto accidents, Nevada does not have an interest in determining exactly how that resident gets compensated—i.e., which insurer among several ultimately bears the costs. Thus, the remainder of this analysis deals with the choice between the application of Minnesota law and the application of Massachusetts law.

### 1. *Predictability of Result*

"Predictability of results is of great importance in the contractual field," *Schoffman v. Cent. States Diversified, Inc.*, 69 F.3d 215, 219 n.10 (8th Cir. 1995), where the parties "have acted in reliance on a[] state's laws," *Whitney*, 700 F.3d at 1125. This factor serves to "preserv[e] the parties' justified expectations" when they entered into their contractual relationship. *Jepson*, 513 N.W.2d at 471.

The Westfield policy was issued to a Minnesota resident, providing insurance coverage for his Minnesota home and four personal vehicles that were registered in Minnesota. The premiums charged for this coverage were calculated based on Minnesota rates, and the policy

provided coverage mandated by Minnesota law. The Westfield policy also clearly excluded, to the extent possible, any coverage for employment-based liabilities.[4]

The Hartford and Travelers policies were issued to a Massachusetts-based employer, Rheinzink, and provided coverage mandated by Massachusetts law with premiums calculated at Massachusetts rates. Rheinzink is a national corporation, with representatives located all across the United States. The Hartford policy provided commercial general liability coverage, and the Travelers policy provided commercial automobile coverage. Because Hartford and Travelers were insuring a national corporation, and providing liability coverage for the acts of numerous Rheinzink employees located across the country, it would have been predictable that the Hartford and Travelers policies would be governed by the laws of an employee's home state, such as Minnesota. *See Bd. of Regents of the Univ. of Minn. v. Royal Ins. Co. of Am.*, 503 N.W.2d 486 (Minn. Ct. App. 1993), (stating that where insurance policies were issued to New York corporations that did business in all fifty states, it was predictable that the laws of other states would apply), *rev'd in part on other grounds*, 517 N.W.2d 888 (1994). It was not as predictable, however, that the Westfield policy, covering an individual resident's home and personal vehicles, and excluding coverage for business-related activities, would be governed by the state laws of the insured's employer. Thus, this factor weighs in favor of applying Minnesota law.

### 2. *Maintenance of Interstate and International Order*

In analyzing this factor, the Court is "primarily concerned with whether the application of Minnesota law would manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 471. "An aspect of this

---

[4] The Westfield policy excludes personal liability coverage arising out of or in connection with business activities, as well as for auto liability incurred while using a vehicle while engaged in any business. Consistent with Minnesota's No-Fault Automobile Insurance Act, Minn. Stat. §§ 65B.41-.71, the policy provides an exception to the exclusion for the use of rental vehicles.

11

concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." *Id.* Consideration of this factor is largely intended to reduce opportunities for forum shopping, and prevent people "who purposefully seek advantages offered by other state . . . to avoid the burdens associated with their choice." *Id.* In analyzing this factor, the Court "looks at the contacts the state has with the issues being litigated and the risk of encouraging forum shopping by applying that state's law." *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1394 (8th Cir. 1997).

There is no indication that Plaintiffs engaged in forum shopping when bringing suit in Minnesota. In fact, application of Minnesota law, rather than Massachusetts or Nevada law, may very well require Westfield to pay *more* than its pro-rata share of liability coverage, if it is determined that Westfield provides primary coverage for this incident (as both Defendants assert). Wohlert is a Minnesota resident, and his insurance policy with Westfield was negotiated in Minnesota and based on Minnesota coverage requirements and prices. There is nothing to suggest to this Court that Plaintiffs' choice of forum was an attempt to seek Minnesota benefits while burdening the insurance system of other states. The issue being litigated is the priority of coverage between three different insurance policies, concerning an accident caused by a Minnesota resident while working for a Massachusetts-based employer. One of the insurance policies originated from and related to Minnesota, the other two had more significant contacts with Massachusetts. Overall, the Court cannot conclude that there are stronger contacts with either one of those two states, and so this factor remains neutral.

### 3. *Simplification of the Judicial Task*

This factor has little relevance here, whether the Court is "capable of determining, interpreting, and applying either the law of [Massachusetts] or the law of Minnesota." *Nesladek*,

46 F.3d at 739; *see also Jepson*, 513 N.W.2d at 472 (stating that "simplification of the judicial task[] is not a significant factor" where "the law of either state could be applied without difficulty"). The Minnesota Court of Appeals, however, has stated that while the court is "fully capable of administering the law of another forum if called upon to do so," this factor is "[n]evertheless . . . obviously advanced when a Minnesota court applies Minnesota law." *Gimmestad v. Gimmestad*, 451 N.W.2d 662, 666 (Minn. Ct. App. 1990); *see also Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 455 (Minn. Ct. App. 2001). This factor therefore perhaps slightly favors the application of Minnesota law, but it is not a significant factor in this Court's consideration.

   4. ***Advancement of the Forum's Governmental Interest***

This factor examines "which choice of law most advances a significant interest of the forum." *Jepson*, 513 N.W.2d at 472. "This factor is designed to ensure that Minnesota courts do not have to apply rules of law that are 'inconsistent with Minnesota's concept of fairness and equity.'" *Schumacher v. Schumacher*, 676 N.W.2d 685, 691 (Minn. Ct. App. 2004) (quoting *Medtronic*, 630 N.W.2d at 455).

There is a strong interest in people "get[ting] the benefit of the contracts they enter into." *Jepson*, 513 N.W.2d at 472. Wohlert is a Minnesota resident and insured under a Minnesota insurance policy with Westfield, and so there is an interest in seeing that Wohlert and Westfield get the benefit of their contract. Hartford and Travelers, however, issued an insurance policy to a Massachusetts-based entity, and so there is also an interest in allowing them to receive the benefit of the contracts they entered into. Massachusetts, however, has adopted an approach under which insurance policies containing conflicting excess insurance clauses "are mutually repugnant and both insurers must contribute to the loss." *Mission Ins. Co. v. U.S. Fire Ins. Co.*,

13

517 N.E.2d 463, 467 (Mass. 1988). Minnesota courts, on the other hand, have consistently and explicitly rejected that approach, favoring a "more complex" approach that considers the total policy insuring intent and examines how closely each policy contemplated the risk insured against. *Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 239 N.W.2d 445, 446-47 (Minn. 1976). Minnesota courts have viewed this latter approach as the more fair method of determining priority of insurance coverage, and application of Massachusetts' formulaic rule would be inconsistent with Minnesota's well-established concept of fairness in dealing with conflicting "other insurance" clauses. *See Gimmestad*, 451 N.W. at 666 ("[T]he concern is that 'Minnesota courts not be called upon to determine issues under rules, which, however accepted they may be in other states, are inconsistent with our own concept of fairness and equity.'" (citation omitted)). This factor therefore favors the application of Minnesota law.

### 5. *Application of the Better Rule of Law*

The better rule of law is the "rule that made 'good socio-economic sense for the time when the court speaks.'" *Jepson*, 513 N.W.2d at 473 (citation omitted). The Court should only reach this fifth factor "when the choice-of-law question remains unresolved after the other factors are considered." *Medtronic*, 630 N.W.2d at 455. Because the other factors weigh in favor of application of Minnesota law, the Court will not address this final factor.

In sum, the Court concludes that Minnesota law applies to this dispute.

### B. Priority of Insurance

All three insurers agree that they each insure Wohlert against the Nevada accident. But each of the insurance policies contains an "other insurance" clause, declaring its coverage to be excess to any other applicable coverage. "When it is clear that two or more companies are among themselves liable to the insured for his loss but the apportionment among the companies

cannot be made without violating the other insurance clause of at least one company, then the courts must look outside the policies for rules of apportionment." *Integrity*, 239 N.W.2d at 446. "[P]riority among insurance policies is . . . to be determined by . . . an analysis of the function and intent of the policies." *Cargill, Inc. v. Evanston Ins. Co.*, 642 N.W.2d 80, 88 (Minn. Ct. App. 2002). "Minnesota has used two tests for this purpose: the 'closest-to-the-risk' test . . . and the 'total-policy-insuring-intent' test." *Id.*

The "total policy insuring intent" test "'applies when the policies were intended to cover risks different in kind and in size' and is considered 'broader' than the three-part analysis" of the "closest-to-the-risk" test. *N. Star Mut. Ins. Co. v. Midwest Family Mut. Ins. Co.*, 634 N.W.2d 216, 223 (Minn. Ct. App. 2001) (citation omitted). Because the Westfield policy is a personal home and automobile policy, the Travelers policy is a commercial automobile policy, and the Hartford policy is a commercial general liability policy, the three policies cover "risks different in kind and in size" and so the "total policy insuring intent" test is the more appropriate test to use under these circumstances. Under the "total policy insuring intent" test, the court "allocate[s] respective policy coverages in light of the total policy insuring intent, as determined by the primary policy risks upon which each policy's premiums were based and as determined by the primary function of each policy." *Integrity*, 239 N.W.2d at 446. If the court determines that the insurers "are concurrently liable, each must pay a pro rata share of the entire loss." *Id.* at 447. But "if one insurer is primarily liable and the other only secondarily, the primary insurer must pay up to its limit of liability, and then the secondary insurer must pay for any excess up to its own limit of liability." *Id.*

All three policies clearly intended to cover risks related to the use of rental vehicles. The Hartford and Travelers policies, however, specifically intended to cover risks related to an

15

employee's use of a rental vehicle during the course of business. Each of those policies contained a specific endorsement providing coverage for a Rheinzink employee's use of a rental vehicle, either "on [Rheinzink's] behalf and at [Rheinzink's] direction," in the case of the Hartford policy, or "while performing duties related to the conduct of [Rheinzink's] business," in the case of the Travelers policy. Each of those policies also charged a separate premium for that specific coverage—Hartford charged a premium of $233 for the endorsement, and Travelers charged a premium of $32 for the endorsement. These two policies most closely contemplated the risk of the very event that ultimately transpired in this case—an accident involving a Rheinzink employee's use of a rental vehicle while performing Rheinzink business. It was this risk upon which the additional premiums were based, and which was specifically addressed by the endorsements to the policies.

In contrast, the Westfield policy, which is a personal home and automobile insurance policy, clearly intended *not* to cover employment-related risks, to the full extent permitted by law. As explained above, the Westfield policy excludes personal liability coverage arising out of or in connection with business activities, as well as for automobile liability incurred while using a vehicle while engaged in any business. Minnesota insurance law, however, requires that Minnesota automobile insurers provide coverage for rental vehicles, and so the Westfield policy provides an exception to the business exclusion for the use of rental vehicles. But even the Minnesota statute governing insurers of rental vehicles provides that "[i]f the person renting the motor vehicle is also covered by the person's employer's insurance policy . . . the reparation obligor under the employer's policy . . . has primary responsibility to pay claims arising from use of the rented vehicle." Minn. Stat. § 65B.49, subdiv. 5a(d). While this statute is not directly enforceable against the Hartford and Travelers policies, *see State Farm Mut. Auto. Ins. Co. v.*

*Great West Cas. Co.*, 623 N.W.2d 894, 898-99 (Minn. 2001), it does bolster Westfield's position that the function of its policy was not to provide coverage for employment-related activities. Rather, the Westfield policy was drafted in light of Minnesota law providing that where possible, an employer's applicable policy or policies would provide primary coverage for an incident involving the use of a rental vehicle during the course of business. *See also Turner v. Mut. Serv. Cas. Ins. Co.*, 663 N.W.2d 36, 41 (Minn. Ct. App. 2003) ("[I]f . . . an employer's policy provides coverage for claims arising from the use of rental vehicles, that coverage is primary.").

In sum, upon examining "the primary policy risks upon which each policy's premiums were based" and "the primary function of each policy," the Court concludes that the Westfield policy is the policy least intended to cover the type of risk involved in this case. The remaining question is therefore the priority of coverage between the Hartford and Travelers policies.

The Hartford policy is a commercial general liability policy, intended to cover many types of business risks. It generally excludes coverage for bodily injury or property damage arising out of the use of any automobile, but under the "Hired Auto and Non-Owned Auto" Endorsement, creates an exception to the exclusion for hired and non-owned autos. The Travelers policy is a commercial automobile policy, primarily intended to cover risks related to automobile accidents occurring during the course of business, and it, too, included an endorsement for autos hired or rented by employees. This case involves an automobile accident that occurred during the course of business. When the insurance policies are examined as a whole, coverage of this type of risk was the primary function of the Travelers commercial automobile policy. The Hartford policy, in contrast, provided general business liability coverage, and only provided very limited coverage for liability arising from automobile accidents.

Thus, the total policy insuring intent test favors a finding that the Travelers policy provides primary coverage, with the Hartford policy providing secondary coverage, and the Westfield policy providing tertiary coverage. *See, e.g.*, *Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co.*, 567 N.W.2d 71, 80 (Minn. Ct. App. 1997) (holding that in a claim against a church for negligent supervision of a pastor, the pastoral professional liability policy was primary and the commercial general liability policies were secondary, because the professional liability policies "were designed to meet the type of liability to which [the church] was exposed as a result of [the pastor]'s activities, while the CGL policies covered that liability only incidentally"); *N. Star Mut. Ins. Co.*, 634 N.W.2d at 224 (concluding that a farm policy that provided general insurance coverage for bodily injuries and excluded almost all liability arising from the maintenance of a motorized vehicle was excess to a vehicle policy which covered most such liability, when the claim involved injury caused during the replacement of a tire).

## C. Date Upon Which Travelers' Duty to Defend Was Triggered

A "tender of defense" triggers an insurer's duty to defend. *Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 531 (Minn. 2003). The tender is complete when an insured gives the insurer both notice of a claim and the opportunity to defend. *Id.* It is undisputed that Travelers was not notified of the Southam accident and litigation until April 2012. At that time, the litigation in Nevada was still ongoing and Travelers had the opportunity to provide a defense if it so desired.[5] Therefore, Travelers' duty to defend was not triggered until

---

[5] According to the parties, as of the March 7, 2013 hearing on these motions, the Southam litigation was still ongoing. Travelers contends that it was not provided with an opportunity to defend until it was served with the Amended Complaint in this action on July 5, 2012. Travelers admits, however, that in June 2012, prior to receiving the Amended Complaint, Travelers offered to share in the defense of the Southam litigation with Hartford. *See* Travelers' Answers to Pl.'s Interrog. 2b. Thus, Travelers was clearly aware before July 5 that it had the opportunity to provide a defense in the Southam litigation. The Court therefore rejects Travelers' argument that

18

April 2012. Because no specific date in April was provided to the Court, the Court concludes that Travelers' duty was triggered on April 30, 2012. Prior to that date, Hartford had the primary responsibility of providing Wohlert's defense, and Westfield's duty to defend was secondary. Hartford and Travelers are required to reimburse Westfield for the defense fees and costs it incurred, in accordance with the dates and insurance priority as set forth in this order.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 37] is GRANTED.

2. Defendant Traveler's Motion for Summary Judgment [Docket No. 50] is DENIED.

3. Defendant Hartford's Motion for Summary Judgment [Docket No. 57] is DENIED.

4. The Court declares that the Travelers policy provides primary coverage for Wohlert, the Hartford policy provides secondary coverage, and the Westfield policy provides tertiary coverage. The Westfield policy is therefore excess to both the Hartford and Travelers policies. The Court further declares that Travelers' duty to defend was triggered on April 30, 2012. Prior to that date, Hartford bore the primary responsibility for Wohlert's defense.

5. Travelers and Hartford must reimburse Westfield any indemnity payments and defense fees and costs incurred, in accordance with the order of priority as set forth in this order.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 27, 2013

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

its duty to defend was not triggered until July 5, 2012, as it had been provided with notice and an opportunity to defend in April 2012.